## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT MICHAEL SHENK, Derivatively on Behalf of SIRIUS XM RADIO INC., <br><br> Plaintiff, <br><br> v. <br><br> MELVIN ALAN KARMAZIN, GARY PARSONS, JOAN L. AMBLE, LEON D. BLACK, EDDY W. HARTENSTEIN, JAMES P. HOLDEN, JAMES F. MOONEY, JACK SHAW, GREGORY B. MAFFEI, JOHN C. MALONE, DAVID J.A. FLOWERS, CARL E. VOGEL, and VANESSA A. WITTMAN, <br><br> Defendants, <br><br> -and- <br><br> SIRIUS XM RADIO INC., <br><br> Nominal Defendant. | Case No. 11-cv-02943-JSR_____ <br><br> **<u>Jury Trial Demanded</u>** |

## <u>VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff, by his undersigned attorneys, submits this Verified Amended Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant Sirius XM Radio Inc. ("Sirius" or the "Company") against certain directors and officers of Sirius named herein (the "Defendants"). Plaintiff bases his allegations on personal knowledge as to his own acts and on information and belief as to all other allegations, based upon due investigation by counsel, including: (a) review and analysis of public filings made by Sirius and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on Sirius' website concerning the Company's public statements; (d) review of other

publicly available information concerning Sirius and other persons; and (e) allegations and the contents of interviews with factual sources set forth in the complaint in *Blessing v. Sirius XM Radio Inc.*, Civ. No. 1:09-cv-10035-HB (S.D.N.Y.) (the "Antitrust Action"), pending in this Court.

## INTRODUCTION AND OVERVIEW

1.      This is a shareholder derivative action brought by a shareholder of Sirius on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state law, including breaches of fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment, that occurred between February 19, 2007 and the present and that have caused substantial monetary losses to Sirius and other damages, including damages to its reputation and goodwill. On behalf of Sirius, this action seeks damages, corporate governance reforms, an accounting, rescission, and the imposition of a constructive trust to remedy Defendants' violations of law.

2.      Sirius is the surviving company of a merger completed on July 28, 2008 between Sirius Satellite Radio ("Sirius") and XM Satellite Radio ("XM"), the only two providers of satellite digital audio radio services ("SDARS"). Due to the concentrated market for SDARS, the companies were required to obtain regulatory approval for the merger from both the U.S. Department of Justice's Antitrust Division ("DOJ") and the Federal Communications Commission ("FCC"). Sirius and XM, in fact, obtained these necessary approvals through false pretenses, as was only revealed to shareholders and the public much later.

3.      Prior to the merger, Sirius and XM were the only competitors in the market to sell SDARS in the United States. Vigorous competition between Sirius and XM kept SDARS prices stable. In over six years of operation prior to the merger, Sirius never raised its monthly charge, and XM raised its monthly charge only once.

4.      During the relevant period, Defendants made false or misleading statements or omitted to disclose material information relating to the merger between the two companies. Throughout the relevant period, Defendants made numerous false or misleading statements to both the DOJ and the FCC in order to gain the regulatory approval needed to complete the merger.    Aside from misleading federal law enforcement and regulatory officials, the Defendants made various false assertions to shareholders that the newly formed company, Sirius, would not raise rates for its subscription satellite services and, in fact, would lower them as a result of cost savings achieved through the merger itself.

5.      On February 27, 2007, only days after the merger agreement was announced, Sirius' CEO, Defendant Mel Karmazin, testified to the House Judiciary Committee's Antitrust Task Force that the merger between the two companies would *not* lead to an increase in prices to consumers: "We are absolutely convinced this merger will be in the best interest of consumers.   This merger will give consumers more choice *at a lower price* and more importantly, less confusion."   Unbeknownst to Sirius shareholders and subscribers, this assertion was false.  Similar representations were made to the FCC and DOJ—prominently and repeatedly—in Sirius and XM's submissions to those federal bodies for regulatory approval of the merger.  The Joint Application, submitted to the FCC, was incorporated by

reference in the merger proxy statement that Defendants sent to shareholders seeking their approval for the merger.

6.     The emphasis on the merger's ability to produce lower prices was important on several levels. From a regulatory standpoint, FCC and federal antitrust enforcement officials were concerned that the merger would transform the Sirius-XM duopoly into a monopoly, which brings with it the ability to set higher-than-competitive prices. From a consumer's perspective, the merger would be beneficial if it delivered a superior product at a lower price, or in the alternative, a steady price. From a shareholder's perspective, if the combined companies could deliver quality entertainment at steady prices, the merger would lead to prosperity. However, if the companies, post-merger, were to raise the subscription rates, a tremendous consumer backlash would ensue, causing the share prices to plummet, and even more ominously, attract antitrust attention to the new company. This would necessitate the heavy expenses of defending against both government scrutiny and private litigation. Moreover, antitrust enforcement could lead to the imposition of treble damages, which could destroy the combined companies and wipe out shareholder value since Sirius has never been well-grounded financially. In addition, the new company's reputation for honesty and integrity with shareholders, investors, customers, and the public would be irreparably damaged.

7.     That is precisely what did happen. Knowingly entering into a merger that included the above as foreseeable consequences constituted an egregious breach of Sirius' directors and executive officers' fiduciary duties.

8.      In fact, the merger of Sirius and XM has substantially lessened competition in the SDARS market in the United States and has resulted in the creation of a monopoly. Since the merger, the combined company Sirius has predictably abused its monopoly power by raising prices and sustaining such price increases, reducing and limiting the quantity and quality of programming, breaching subscriber contracts, and making false and misleading statements to subscribers and shareholders.

9.      In connection with their applications for regulatory approval of the merger, Sirius and XM predicted that the synergies achieved by the merger would bring cost savings resulting in lower prices to their subscribers and more programming choices. By now, however, it is clear that the impact on consumers has not been as predicted—and promised— by Sirius and XM. To the contrary, while Defendants may have benefitted from the merger, the Company, its subscribers, and its shareholders have only been harmed.

10.     As part of a scheme to woo shareholders and regulators, pre-merger Sirius and pre-merger XM engaged in a prolonged, planned-out campaign to convince these parties that not only would the newly formed company, Sirius, not raise subscription prices after the completion of the merger, but that due to competitive restraints, the new Company, post-merger, *could not* do so. These representations were knowingly false when made.

11.     Thus, on January 25, 2009, Defendants caused Sirius to announce that it would increase the monthly price charged to multi-receiver subscribers. Effective March 11, 2009, Sirius increased the price $2.00 per radio: from $6.99 to $8.99, nearly a 30% increase.

12.     At the time this subscription increase was announced, approximately 20% of Sirius subscribers were multi-receiver subscribers. Of its approximately 20 million

subscribers, roughly 4.0 million have been subject to this 30% increase for each additional receiver used. Sirius is now earning approximately an additional $7.9 million per month, or nearly $90 million annually, through Defendants' breaches.

13.     On March 11, 2009, Sirius began charging $2.99 for all subscribers accessing Sirius or XM programming through the Internet. Up to this point, this fee was only applicable for users accessing the programming via the high-quality 132 kbps (kilobytes per second) connection. Sirius users accessing the programming through the lower-quality 32 kbps or 64 kbps connections could, up until March 11, 2009, do so for no charge.

14.     On June 16, 2009, Sirius announced that it would begin charging all subscribers a so-called Music Royalty Fee. This fee supposedly was merely a "pass-through" of the increase in music royalties that Sirius and XM paid during the period between March 20, 2007 (when Sirius and XM filed their request to the FCC to approve the transfer of broadcast licenses to the combined Company) and July 29, 2009 (one year after the consummation of the merger). Prior to the merger, Sirius and XM both absorbed royalties paid as part of their costs.

15.     For the moment, these and other price increases brought in higher revenues to the Company but such revenues were purchased at the price of lost subscription volume and customer loyalty, substantially impaired consumer and shareholder reputation, the exposure to antitrust and other regulatory enforcement, civil litigation (and corresponding costs of defense), and—most recently—to obligations under a settlement of the Antitrust Action which require Sirius to more than give back and temporary gains achieved by the price increases. These consequences have more than offset any temporary increases in revenues and have led to significantly increased losses at Sirius—rather than the more modest losses or even profits

that would have accompanied a true effort to increase the quality and variety of programming at lower prices.

16.     On September 30, 2009, the Defendants caused the Company to file with the Securities and Exchange Commission ("SEC") its Form 10-Q quarterly report. In that report, the Company attributed its increase in revenue to the rate increases imposed on Sirius consumers post-merger.  The report stated, "This increase in revenue was due mainly to increased rates on multi-subscription packages, revenues earned on internet packages, the introduction of the U.S. Music Royalty fee and the sale of 'Best of' programming."

17.     These belated revelations also evidenced Defendants' prior falsification of Sirius' business prospects due to Defendants' false statements made on behalf of the Company.  As investors ultimately learned, Defendants intentions, as directors of Sirius or pre-merger XM, were *always* to use the market power provided by the merger to raise prices.

18.     The Defendants must account to Sirius for any damages that the Company may suffer or has suffered as a result of the monopolistic behavior exhibited by the Company after the merger, including any liability or civil penalties resulting from any pending or future antitrust suits or enforcement efforts, as well as their breaches of fiduciary duties and their violations of the federal securities laws.

**JURISDICTION AND VENUE**

19.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  All Defendants are completely diverse from Plaintiffs.  The amount in controversy exceeds $75,000.00.  In addition, the Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 (federal question and pendent jurisdiction principles).

20.     The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

### Plaintiff

22.     Plaintiff Robert Michael Shenk is and was during the relevant period an owner and holder of Sirius common stock.  He is a citizen of Pennsylvania.

### Nominal Defendant

23.     Nominal Defendant Sirius is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

### Defendants

24.     Defendant Melvin Alan Karmazin ("Karmazin") is Sirius' Chief Executive Officer and is a member of the Board of Directors, both of which positions he has held since 2004.  Prior to that, he was the COO, President, and a director of Viacom Inc.  Because of Karmazin's positions, he knew, consciously disregarded, was reckless and grossly negligent in

not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the relevant period, Karmazin participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders. Karmazin received $43,466,790 in salary and other compensation from Sirius in 2009. He received $9.9 million in such compensation in 2010. Despite consciously saddling Sirius with crippling debt and exposing it to massive liability under the antitrust laws, as set forth herein, Karmazin exercised his domination and control over other Board members to get them to approve an agreement whereby Sirius would award him stock options currently worth approximately $110 million if there is a change-in-control transaction at Sirius. Thus, if someone scoops up Sirius at stock price levels depressed as a result of Karmazin's willful bad faith and ineptitude, Karmazin will emerge the undeserving winner—yet again. Karmazin is a citizen of New York.

25.    Defendant Gary Parsons ("Parsons") was a Sirius director from August 2008 to November 2009. He was the Chairman of the Board of XM prior to the merger with Sirius, and also served as Chairman of the Board of the combined company until his departure. Parsons is a citizen of the District of Columbia.

26.    Defendant Joan L. Amble ("Amble") is a Sirius director and has been since August 2008. She was a director of XM from December 2006 until the merger. Amble is the Chair of Sirius' Audit Committee. From 2006 to 2008, Amble served as a director for XM. Because of Amble's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the relevant period, Amble participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders. Amble received $150,000 in fees and other compensation from Sirius in 2009. Amble is a citizen of Connecticut.

27.    Defendant Leon D. Black ("Black") has been a Sirius director since the merger was completed and prior to that was a Sirius director since June 2001. Because of Black's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection

therewith.   During the relevant period, Black participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders.   Black received $70,000 in fees and other compensation from Sirius in 2009.   Black is a citizen of New York.

28.     In their 2008 proxy report, Risk Metrics, the nation's largest independent shareholder advisory firm, recommended a "Withhold" vote on Black, due to issues with his attendance at Board meetings of Sirius.   In their 2009 proxy report, Risk Metrics recommended a "No" vote on Black.   In shareholder voting in 2010, Black received 408,528,344 votes in favor, and 458,481,167 votes against.   Despite failing to be re-elected to the Board by a clear majority of shareholders, Black continues to serve on the Board, with the acquiescence of the other Defendants and in breach of their duty of loyalty.

29.     Defendant Eddy W. Hartenstein ("Hartenstein") is a Sirius director and Chairman of the Board and has been since 2008.   From May 2005 until the closing of the merger with XM in July 2008, Hartenstein served as a director of XM.   Hartenstein is a member of Sirius' Audit Committee.   Because of Hartenstein's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.   During the relevant

period, Hartenstein participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders. Hartenstein received $120,000 in fees and other compensation from Sirius in 2009. Hartenstein is a citizen of California.

30.     Defendant James P. Holden ("Holden") has been a Sirius director since the merger was completed and prior to that was a Sirius director since 2001.  Holden serves as a member of Sirius' Audit and Compensation Committee.  Because of Holden's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to her in connection therewith.  During the relevant period, Holden participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders. Holden received $120,000 in fees and other compensation from Sirius in 2009.  Holden is a citizen of Michigan.

31.     Defendant James F. Mooney ("Mooney") has been a Sirius director since the merger was completed and prior to that was a Sirius director since July 2003.  Mooney serves on Sirius' Compensation Committee and Nominating and Corporate Governance Committee.

Because of Mooney's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the relevant period, Mooney participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders.  Mooney received $130,000 in fees and other compensation from Sirius in 2009.  Mooney is a citizen of New Jersey.

32.     Defendant Jack Shaw ("Shaw") is a Sirius director and has been since August 2008. Prior to that, he was a director of XM Satellite since May 1997.  Shaw serves on Sirius' Compensation Committee and the Nominating and Corporate Governance Committee.  From May 1997 until the closing of the merger, Shaw served as a director for XM.  Because of Shaw's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the relevant period, Shaw participated in the wrongful conduct and issuance

13

of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders. Shaw received $120,000 in fees and other compensation from Sirius in 2009. Shaw is a citizen of Michigan.

33.     Defendant John C. Malone ("Malone") is a Sirius director and has been since April 2009. Malone is the Chairman and controlling shareholder of Liberty Media Corp. ("Liberty"). Malone sits on the Board as one of the five directors designated by holders of Sirius' Series B-1 Preferred Stock, referred to herein as the "Malone Group," which imposed predatory financing on Sirius in February 2009. Because of Malone's position at Sirius, and his participation in the Malone Group, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the relevant period, Malone participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders. Malone received $95,000 in fees and other compensation from Sirius in 2009. Malone is a citizen of Colorado.

34.     Defendant Gregory B. Maffei ("Maffei") is a Sirius director and has been since March 2009. Maffei is the CEO of Liberty. Maffei sits on the Board as one of the five

directors designated by the Malone Group. Because of Maffei's position at Sirius and his participation in the Malone Group, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the relevant period, Maffei participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders. Maffei received $105,500 in fees and other compensation from Sirius in 2009. Maffei is a citizen of Colorado.

35.    Defendant David J.A. Flowers ("Flowers") is a Sirius director and has been since April 2009. Flowers is the Chief Financial Officer of Liberty. He sits on the Board as one of five directors designated by the Malone Group. Because of Flowers' position at Sirius and his participation in the Malone Group, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the relevant period, Flowers participated in the wrongful

conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders.  Flowers received $95,000 in fees and other compensation from Sirius in 2009.  Flowers is a citizen of Colorado.

36.    Defendant Carl E. Vogel is a Sirius director and has been since April 2011. Vogel sits on the Board as one of five directors designated by the Malone Group.  Because of Vogel's position at Sirius and his participation in the Malone Group, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the relevant period, Vogel participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders.  Vogel is a citizen of Colorado.

37.    Defendant Vanessa A. Wittman is a Sirius director and has been since April 2011. Wittman sits on the Board as one of five directors designated by the Malone Group. Because of Wittman's position at Sirius and his participation in the Malone Group, she knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius

including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the relevant period, Wittman participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sirius shareholders. Wittman is a citizen of Colorado.

**Other Persons Not Named as Defendants**

38.    Lawrence F. Gilberti ("Gilberti") has been a Sirius director since the merger was completed and prior to that was a Sirius director since 1993. Gilberti serves on Sirius' Nominating and Corporate Governance Committee and chairs the Compensation Committee. Because of Gilberti's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sirius including it finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Although he is not named as a Defendant herein, during the relevant period, Gilberti participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other

statements made to the press, security analysts and Sirius shareholders. Gilberti received $140,000 in fees and other compensation from Sirius in 2009.

## DEFENDANTS BREACH THEIR FIDUCIARY DUTIES TO SHAREHOLDERS

39.     Defendants, by their fiduciary duties of care, good faith, and loyalty, owe to Sirius a duty to insure that the Company's public filings and statements fairly represent the operations and business prospects of the Company.   In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

40.     This material, non-public information principally concerned Sirius' misleading statements regarding the Company's pricing expectations and their purported inability to raise subscription rates post-merger. The Defendants owed a fiduciary duty to Sirius to ensure that Sirius' relevant period statements properly disclosed all material facts concerning the Company.

41.     Defendants are also obligated to ensure that the Company does not violate the laws, including the federal securities and antitrust statutes, of all jurisdictions in which it operates; and does not lie to federal regulators and law enforcement officials.

42.     Defendants knowingly or recklessly or in bad faith violated their duties.

## Prior to the Sirius-XM Merger, the Two Companies Competed Vigorously

43.     Sirius's primary source of revenue is subscription fees, with most of its customers subscribing on an annual, semi-annual, quarterly or monthly basis. As of December 31, 2009, Sirius had 18,772,758 subscribers. Sirius sells its service directly to consumers, who activate the service with Sirius and are billed directly for the service by Sirius. Sirius

customers can manage their accounts themselves directly on the Sirius website. All of Sirius's customers are direct purchasers of SDARS from Sirius.

44.     Before the merger created Sirius, Sirius and XM were the only providers of SDARS in the United States. Each company spent billions of dollars to enter the SDARS market and once Sirius entered the market in 2002, the two SDARS providers engaged in vigorous competition.

45.     In April 1997, the FCC auctioned 25 MHz of spectrum in the S-bank allocated to satellite radio. XM was one of the winning bidders, and was awarded the license to provide satellite radio services in the 2332.5-2345 MHz band.  Sirius was another winning bidder, and was awarded rights to provide satellite radio in the 2320-2332.5 MHz band.

46.     After being awarded their broadcast licenses, Sirius and XM invested over five billion dollars each, primarily to: (1) develop and upgrade their networks; (2) design chipsets and radios capable of receiving their service; (3) subsidize the cost of such chipsets and radios to encourage their distribution; (4) develop subscriber-based management systems and other information technology; (5) market their brands; and (6) create programming for subscribers.

47.     XM launched its broadcast service in September 2001. As of December 31, 2006, it provided SDARS to approximately 7.6 million subscribers in the United States.

48.     Sirius began providing SDARS in February 2002. As of December 31, 2006, it had approximately 6 million SDARS subscribers in the United States.

49.     Between February 2002 and July 2008, when both XM and Sirius were operating and providing SDARS to their subscribers, the two companies competed vigorously for customers on a price and non-price basis.

50.     On a non-price basis, the companies competed by trying to deliver better content. This led to content-provider agreements with "shock jock" Howard Stern and most major sports leagues among numerous others. Consumers benefitted from this competition as they were given a choice based on their programming preferences. Also content-related, Sirius launched its music channels as commercial free, which caused XM to subsequently remove commercials from almost all of its music channels.

51.     XM and Sirius also competed in driving innovation in SDARS technology. Both companies invested in and touted receivers developed to receive their broadcasts based on appearance, portability, screen size, battery life, etc.  Consumers benefitted from this vigorous non-price competition.

52.     Consumers also benefitted from the strong competition between Sirius and XM in the form of stable pricing. In over six years of operation prior to the merger, Sirius never raised its monthly charge from $12.95. XM raised its monthly charge only once, in the second quarter of 2005, when it increased its price from $9.99 to match Sirius at $12.95. See Sirius and XM's Joint Opposition to Petitions to Deny and Reply Comments at 13-14 n.31 (MB Docket No. 07-57 (July 24, 2007) ("Joint Opposition").

53.     Even as the companies added content at significant cost to themselves, subscription costs remained stable. As Karmazin noted, "Sirius started its subscription service in 2002. And the price was $12.95. And has not had a price increase on that $12.95 since then. After that period of time the company added content like Howard Stern [with a $500 million 5-year contract], and the NFL [with a $220 million 7-year contract], NASCAR, and various

other programming elements without changing the price point." Sirius Q2 2009 Earnings Call Transcript. XM's presence in the market constrained it from being able to do so.

54.     The same was true of XM's content agreements. For example, XM signed an exclusive 11-year agreement with Major League Baseball ("MLB") for $650 million. It originally added a $10 monthly fee for subscribers who wanted access to the MLB broadcasts. However, XM later eliminated that additional fee and instead included access to MLB broadcasts in the base cost of the service—due to competition from Sirius.

**Through the Merger, Defendants Saddle Sirius with Catastrophic Debt, and Cause it to Pay the Second Largest Fine in the History of the Federal Communications Commission**

55.     Approximately two years after Sirius and XM won their broadcasting licenses, they entered into merger discussions. These discussions were later abandoned due to an unfavorable regulatory environment. XM's stock reached a high of approximately $40 in December 2004 but then quickly dropped after subscriber growth fell short of the company's expected 4.8 million subscribers. Without enough subscribers, investors were concerned as to the ability of XM to repay its debt. Moreover, Sirius was taking market share away from XM.

56.     The two companies rekindled merger discussions in 2006. A merger agreement—expressly subject to necessary FCC and other regulatory approvals—was executed and publicly announced in February 2007.

57.     Thus, on February 19, 2007, Sirius and XM entered into a Merger Agreement. Under the Agreement, a wholly-owned subsidiary of Sirius was to be merged into XM, with XM being the surviving entity—thus making XM a subsidiary of Sirius. At the effective time of the merger, each share of XM common stock was to be converted into the right to receive 4.6 shares of common stock of Sirius. Existing preferred stock of XM was to be converted

into 4.6 shares of a newly designated series of Sirius preferred stock with substantially the same rights as the XM stock so converted. The Board of Directors of the combined entity was to comprise four members elected by Sirius and four members elected by XM, as well as Karmazin, Parsons (the Chairman of XM), and two other members selected by creditors.

58.     Karmazin led the merger negotiations on behalf of Sirius. However, he did so without the consent of the Sirius Board, actively negotiating for months without obtaining the consent of the Board for his unilateral contacts with XM executives—a fact which is confirmed by the silence on this issue of Sirius' October 2007 proxy statement seeking shareholder approval for the merger.

59.     To obtain regulatory approval of the merger, Sirius was required to demonstrate to the FCC that the merger would not have an anti-competitive effect on the market for satellite subscription services. Karmazin and the other Defendants caused Sirius to make such representations despite the fact that Sirius would, in any merger, be required to assume XM's massive debt—and that the merged entity would be under pressure (to service that debt) to raise prices on its subscription services.

60.     Thus, in connection with the merger, Defendants caused Sirius (and their counterparts at XM caused XM) to file a Joint Application to the FCC for permission to transfer control of XM's operations to Sirius and combine services. In the Joint Application, dated March 20, 2007, Defendants made express representations regarding the combined entity's inability and unwillingness to raise prices, in spite of Defendants' knowledge that such a step would, at the Company's current burn rate (including grossly excessive salaries to

Karmazin and others), only be made more likely in the future and that they, in fact, were planning to do so as soon as public attention was diverted.

61.     These representations included the following:

(a)     The Joint Application stated, in multiple places, that approval of the merger would result in "lower prices."

(b)     The Joint Application repeatedly stated that the merger "will not harm competition in any market."

(c)     The Joint Application repeatedly stated that the merged company would be capable of commercializing interoperable radio receivers, and that the effect of the merger would eliminate the need for anyone to own such a receiver since "current subscribers [could] continue to receive substantially similar service at the same price over their existing satellite radio."

62.     Each of these representations to the FCC was false and misleading when made:

(a)     Sirius did not have the ability (due to its crushing debt load and the even greater weight of XM's assumed debt load) to, and Defendants did not have the intention of, offering "lower prices" after the merger was completed, and Defendants well knew these facts at the time of the Joint Application and when Sirius later issued a Proxy Statement seeking shareholder approval for the merger and incorporating the Joint Application in its entirety by reference.

(b)     Similarly, there was neither intention nor ability not to take steps which would harm competition through the merger.  As Defendants well knew, the combined Company would receive a short-term boost to revenues by raising prices after the merger (long

enough to justify awarding Karmazin and other lavish stock option awards and other emoluments), thereby directly harming competition in both the market for satellite radio services and market for audio entertainment.

(c)     Sirius and XM never lacked the ability to commercialize truly functional interoperable radio units; they merely saw no reason to do so, despite being ordered to do so by the FCC in 1997, and Defendants simply preferred to prevaricate and stall for time with the FCC for the previous ten years rather than comply with an FCC order. Alternatively, if Sirius and XM previously lacked the ability to commercialize interoperable radios, they would not gain any newfound ability to do so following the merger. Nor was there ever an intention to offer current subscribers the ability "to continue to receive substantially similar service at the same price over their existing satellite radio," thereby obviating the need for an interoperable unit. In point of fact, practically as soon as the merger was consummated, the combined Company merely aggregated a partial subset of programs from the Sirius satellite feed to be offered on XM radios, and did the same with XM programs to be offered on Sirius radios, all while upcharging subscribers for this allegedly extra "Best of" feature.

63.     Based on Defendants' misrepresentations to the FCC and the DOJ (which also must weigh in and not oppose the merger), the merger received the necessary federal approvals.

64.     However, regulatory approval could only be secured after Sirius agreed, on August 5, 2008, to pay a $17.4 million penalty to the FCC—an amount which Defendants claimed was merely a "voluntary contribution." This fine was the second largest in FCC history. The fine was paid to settle an FCC investigation into Sirius' failure, despite an earlier

agreement to do so in response to a 1997 order, to develop and market satellite radio units that were "interoperable" between both Sirius and XM systems—i.e., could receive and display programs from both services in a single menu of programs for subscribers.  For over five years, Defendants had assured the FCC that the Company was working diligently to develop and market a commercially viable interoperable radio.  In fact, Defendants never had any intention of producing or marketing such a unit.  The only fruits of Defendants' efforts were a crude radio unit that could receive signals from both Sirius and XM satellite transmissions but that provided no appreciable functionality in allowing a user to view a combined menu of programs, with no duplication, and easily select and play any particular program, which is what the FCC and all other authorities had meant by "interoperable."  This crude unit was not marketed, or if it was marketed, it was marketed only briefly and in only a tiny sliver of Sirius' actual, nationwide market.  Thus, Defendants engaged in a sustained and systematic violation of both the letter and the spirit of Sirius' earlier agreement to develop and market interoperable radios.

65.     In issuing an order resolving the investigation, the FCC specifically noted the willful obstruction of persons at XM and Sirius, including presumably Karmazin and other Defendants here, of the FCC's prior order regarding interoperable radios.  The Commission held, in the third paragraph of the consent decree (in language duplicating a separate statement of Chairman Kevin J. Martin):

> After reviewing the terms of the Consent Decree and evaluating the facts before us, we find that the public interest would be served by adopting the Consent Decree and terminating the investigations.  We do not come to this conclusion easily.  *The apparently intentional nature of some of the violations resolved by this Order and the Consent Decree and the apparent involvement of certain Sirius*

*personnel in these violations are very troubling.* Indeed, the ability and willingness to conform one's conduct to the requirements of the Commission's Rules are central to the qualifications of any Commission licensee. [Emphasis added.}

66.    A separate statement by Commissioner Deborah Taylor Tate stated:

The licensee that is the subject of today's voluntary forfeiture and consent decree [Sirius] failed to comply—knowingly and repeatedly— with the specifications for its FM modulators and the terms of its Special Temporary Authorizations ("STAs") for more than five years. I believe the Consent Decree we adopt today reflects the gravity of the violations, and the seriousness with which I view them.

67.    Similarly, Commissioner Jonathon Adelstein stated:

In April and June 2006, the Commission launched an investigation into alleged noncompliant XM and Sirius satellite radio devices; and that fall, the Commission learned about widespread unauthorized use of terrestrial repeaters. . . . In light of such unprecedented violations, *it is stunning that the Commission was poised to approve the merger of XM and Sirius before resolving these enforcement matters.* It is inconceivable to me that we would even consider approving such a merger with such a large and serious number of outstanding violations unresolved. [Emphasis added]

68.    The merger required the approval of both Sirius and XM shareholders. To secure such approval, Sirius issued a proxy statement (the "Merger Proxy Statement") on or about October 9, 2007 seeking the Sirius shareholders' approval. The Merger Proxy Statement incorporated by reference in its entirety the Joint Application submitted to the FCC the previous March. It was signed by Karmazin for Sirius and Parsons for XM.

69.    Like the Joint Application, the Merger Proxy Statement stated that the combined company "will provide consumers with more choices and lower prices" and that the merger would "foster the commercial introduction of interoperable satellite radios." Likewise,

the Proxy stated that the merger "will enable satellite radio to maintain competitive prices for subscription [sic] and devices."

70.     Based among other things on these false pretenses, the shareholders of both Sirius and XM approved the merger. Sirius shareholders voted to approve the merger on November 13, 2007. However, Sirius shareholders approved it only be an exceedingly narrow margin that was only tenths of a percentage point above 50 percent. Although Defendants later caused Sirius to report that approximately 96% of "votes cast" had approved the transaction, this was misleading in that the proxy solicitation was engineered so that failure to vote or a vote to "abstain" each would be counted *against* the merger, such that shareholders who opposed the merger needed to do nothing to make their preferences known, and did do nothing. The result was that only shareholders desiring to vote "yes" sent in their proxies.

71.     On July 25, 2008, the FCC, by a 3-2 vote along party lines, approved the merger.

72.     The merger was completed and closed on July 29, 2008.

73.     Following the merger, Defendants continued to represent that the merger would not result in an increase in prices or competitive harm and, in fact, would lead to lower prices, all the while knowing that these representations were false and that Sirius must soon raise prices, harm competition, and expose itself to civil and criminal investigations and penalties under the antitrust laws. Defendants affirmatively concealed the true facts from shareholders, regulators, and the public.

74.     After the merger was complete, Sirius acquired approximately $1.25 billion of XM debt which needed to be refinanced to satisfy provisions demanding repayment if XM

became a unit of Sirius. Implausibly, Karmazin stated publicly that he was unaware of $600 million of XM's debt until very late in the merger process. He stated that he was unaware of this debt until the "eleventh hour." It defies credulity to believe that the CEO of an acquiring company—much less one who conducted unilateral merger negotiations spanning many months—would be unaware of this much debt in the target company. As a consequence, Sirius, under Defendants' direction, was required to issue 300 million additional shares of Company stock to the holders of XM's debt—for the sole purpose of being sold short on the open market, providing an arbitrage or hedge position on the bonds they held.

75.     At the time this was done, Sirius' stock was on the Nasdaq Regulation SHO list for failure to deliver sufficient shares to clear all trades. Thus, there were no shares available to sell short on the open market. This action caused a sudden drop in Sirius share price—and cost shareholders over $1 billion in market capitalization in the space of only one week. Moreover, shortly after the merger, Sirius announced that it must write down $4.8 billion in "good will" charges associated with the acquisition. This was nearly the entire value of the acquired company XM.

76.     In sum, Defendants caused Sirius to enter into a merger transaction that it could not afford, and that afterward caused it to teeter on the brink of bankruptcy. The merger was accomplished only through the deception of Sirius shareholders that the transaction would lower prices, preserve competition, and foster the introduction of interoperable radios.

**Contrary to Repeated Representations to Regulators and Shareholders,
Defendants Cause Sirius to Raise Prices and Act to Restrain Competition**

77.     As detailed herein, since the merger, the combined Company, as led by Defendants, has evaded the price restrictions it offered and it has only marginally expanded

the variety of choices available to subscribers. For example, the self-imposed 36-month price cap was to last until July 28, 2011. Under Defendants' direction, however, Sirius did not wait that long before evading the price cap by raising fees on Internet access and multi-subscriber accounts and by turning a purported royalty cost pass-through into a revenue generating bonanza.

78.     Indeed, Defendants intend for Sirius to raise the $12.95 subscription price once the voluntary commitment it made has expired. Karmazin has stated that "[w]e have . . . our commitment . . . we would not raise that basic $12.95 price point. So that July 28th of 2011, we are hopeful that we have the latitude to do all kinds of pricing initiatives . . . . Until then, what we have done, is we have carved out a mechanism for us to have some tiered pricing . . . . So by keeping best of, it gives us an opportunity to have this tier, and two years from now, we will look at what other changes we might want to make to our pricing structure." Sirius Q2 2009 Earnings Call Transcript. A settlement of the Antitrust Action has delayed the implementation of this plan until December 31, 2011.

- **Defendants Increase Prices to Multi-Receiver Subscribers By 29%**

79.     Before the merger, Sirius and XM offered multi-receiver discounts that permitted subscribers to pay $6.99 per month for each additional radio (for up to five total radios), rather than paying the full $12.95 for each additional radio.

80.     In its efforts to persuade the FCC to approve the merger, Sirius promised not to increase the multi-receiver subscription prices above this level. Joint Opposition at 14.

81.     However, on January 25, 2009, just six months after the merger, Sirius announced that it would increase the monthly price charged to multi-receiver subscribers.

Effective March 11, 2009, Sirius increased the price by $2.00 per radio: from $6.99 to $8.99 per radio, a 29% increase.

82.    As alleged in the Antitrust Action, approximately 20% of Sirius subscribers are multi-receiver subscribers. Of its approximately 18.5 million subscribers, roughly 3.8 million have therefore been subject to this 29% increase for each additional receiver used. Sirius is now earning approximately $7.4 million more per month (assuming the multi-receiver subscribers have one additional receiver and pay on a monthly basis), or nearly $89 million more annually.   Indeed, in a recent quarterly earnings report, the Company attributed its increased revenues in part to the increase in multi-receiver fees.   In the results for the fourth quarter reported on February 25, 2010, the Company noted that the increased average revenue per user to $10.92 "was driven mainly by the sale of 'Best of' programming and increased rates on the company's multi-subscription and Internet packages."   Press Release, Sirius Reports Full Year and Fourth Quarter 2009 Results (Feb. 25, 2010).   The settlement of the Antitrust Action has not required Sirius to cancel this price hike but only to maintain multi-receiver subscriptions "at or below the current [i.e., increased] rate."

■   **Defendants Increase Prices for Internet Access for Existing Subscribers**

83.    Also effective March 11, 2009, Defendants caused Sirius to begin charging $2.99 for all subscribers accessing Sirius or XM programming via the internet.   Prior to this time, this fee was only applicable for users accessing the programming via the high-quality 132 kbps connection.   Sirius and XM users accessing the programming through the lower-quality 32 kbps or 64 kbps connections could do so for free.

84.     Defendants' plan to increase prices for Internet access to programming was never disclosed to the FCC during proceedings relating to the approval of the merger. Defendants caused the Company to use its monopoly power to eliminate the choice of the free option and replace it with a higher-cost option, effectively imposing a price increase of $2.99 per month.  Prior to the merger, competition between XM and Sirius would have constrained both companies from increasing price and reducing choice in this manner.

85.     Although Sirius has settled the Antitrust Action, in doing so, it has not agreed to remove the Internet access charge, but only to maintain it "at or below" $2.99 per month through December 31, 2011.

- **Defendants Cause Sirius to Impose New Fees and Increase Others**

86.   As a result of the merger, XM subscribers became subject to various fees that they would not have incurred under XM's subscriber contract.

87.   While XM and Sirius were competitors, Sirius charged its subscribers (with prepaid subscriptions or a committed subscription period) a cancellation fee but XM did not. The absence of a cancellation fee gave XM a competitive advantage when competing against Sirius for new customers.  After the merger and the elimination of competition, however, Sirius began to charge a $75 cancellation fee for XM subscribers who cancel a one-year or longer subscription during the first year of service.

88.   Similarly, for over six years before the merger, Sirius charged subscribers a transfer fee to switch a subscription from one radio to another, but XM did not.  But now, after the merger, Sirius charges a $15 transfer fee to most XM subscribers and charges a $75 transfer fee for lifetime subscribers—if they are able to transfer their subscriptions at all.

Sirius prohibits any transfer of lifetime subscriptions from radios installed by automakers or automotive dealers.  Thus, if a lifetime subscriber decides to buy a new car and wants to continue her subscription, she must pay the $75 cancellation fee *and* forfeit the money paid on the lifetime subscription, even if she is buying a new car from the same manufacturer and is not switching from XM to Sirius (or Sirius to XM).

89.   Similarly, Defendants caused Sirius to eliminate its discount for on-line activation, resulting in a 50% increase in this fee.

90.   Before the merger, both Sirius and XM provided discounted activation fees for subscribers who activated a SDARS receiver online via the internet, rather than by phone.  The pre-merger activation fees for Sirius subscribers were $10 for online activation, and $15 for activation by phone.  Since the merger, Sirius increased the online activation fee by 50% to $14.99 for XM subscribers and $15.00 for Sirius subscribers.  The lower cost online option was thus eliminated.

- **Defendants Raise Prices Under the Guise of a Royalty Pass-Through**

91.   On July 29, 2009 (one year after the merger), Defendants caused Sirius to use its monopoly power to raise prices by approximately 10%-28% by imposing a "U.S. Music Royalty Fee."  Sirius represented in its customer contract (the "Customer Agreement") that the Royalty Fee was merely a "pass-through" of the increase in music royalties it paid during the period between March 20, 2007 (when Sirius and XM filed their request to the FCC to approve the transfer of broadcast licenses to the combined Company) and July 29, 2009 (one year after the consummation of the merger).  Prior to the merger, Sirius and XM both absorbed royalties paid as part of their costs.

92.     Absent the merger, neither company could have profitably raised prices by adding a Royalty Fee, even if their own royalty expenses had increased.  The history of competition between Sirius and XM establishes that expenses such as royalties—and increases in such expenses—were not passed through in the form of higher rates.  Indeed, before the merger, XM and Sirius both paid music royalties without passing those expenses on to consumers.  However, now that the merger has eliminated competition in the SDARS market, Sirius, as alleged in the Antitrust Action, is now free to exercise its monopoly power to pass on increases in its expenses to consumers, in violation of federal antitrust laws.

**Defendants' Price Hikes are Directly Contrary to Their Representations to Congress, Federal Regulators, Shareholders, and the Public at Large**

93.     On February 28, 2007, Defendant Karmazin falsely testified to Congress that the merger would not lead to less choice or higher costs.  In his written testimony, Karmazin pledged that customers would not lose anything from the merger, because satellite radio "was still competing with everything from iPods to terrestrial radio."

94.     On March 20, 2007, Karmazin reiterated these falsehoods to a Congressional subcommittee when he stated, "If in fact this merger happens, there will be lower prices and more choices for the consumer.  And therefore, that consumer will spend more time listening to satellite radio."  Thus, once again, Karmazin was presenting to Congress that the proposed merger would lead to lower prices for the consumer and a stronger business outlook which in turn would benefit the shareholders.  Both assertions were false.

95.     Defendants' other representations to federal antitrust regulators were no less false.

96.     Because the proposed merger involved the transfer of control of FCC licenses, federal law required Sirius and XM to apply to the FCC for approval of the transfer.  They filed such an application on March 20, 2007. *See* XM Satellite Radio Holdings Inc., and Sirius Satellite Radio Inc., Consolidated Application for Authority to Transfer Control (MB Docket No. 07-57), filed with the FCC, March 20, 2007 (the "Application").

97.     In concluding its review of the proposed merger, the FCC recognized its anticompetitive potential. *See* FCC Memorandum Opinion and Order and Report and Order ("FCC Order" or the "Order") at 5 (July 25, 2008).

98.     In an effort to induce the FCC to approve the license transfer, Sirius and XM offered several non-binding conditions, which would impose voluntary constraints on the merged entity's ability to exercise its enhanced market power.  These conditions included a three-year price freeze on the basic subscription fee, the addition of new programming, and provision of other services that would purportedly enhance consumer welfare.

99.     In addition, Sirius and XM executives pledged that the merger would produce hundreds of millions of dollars in efficiencies, which the merged entity would pass on to consumer in the form of lower prices.  David Frear, presently the Executive Vice President and Chief Financial Officer of Sirius, who occupied the same position with Sirius, told the FCC that:

> Prior to the announcement of this merger and immediately thereafter, securities analysts estimated that there would be efficiencies from the merger of Sirius and XM Satellite Radio ("XM") on the order of hundreds of millions of dollars annually. . . Sirius' management independently considered the potential for synergies and cost savings from a merger with XM and also believe that there would be hundreds of millions of dollars in annual efficiencies.
> * * * *

> [I]t is my professional opinion and belief that a merger of Sirius and
> XM will result in significant, ***cognizable synergies in every line item
> of the income statement that will benefit consumers*** and that are not
> achievable without this merger.

Decl. of Frear ¶¶ 3, 5, Ex. D to Joint Opposition (emphasis added).

100.    The Application predicted that "[t]he synergies resulting from the merger will
allow the combined company to provide consumers ***lower prices*** and ***more*** programming
choices." Application at 9 (emphasis added).

101.    Sirius pledged that "no satellite radio subscriber will have to pay more . . . as a
result of the merger." FCC Order at 11-12; *see also* Joint Opposition at 13. Sirius and XM
specifically committed that "[t]he combined company will not raise the retail price for its basic
$12.95 per month subscription package, the a la carte programming packages . . . and the new
programming packages . . . for thirty six months after consummation of the merger." FCC
Order at 88, 91.

102.    Sirius also promised that "[s]ubscribers will also be able to continue their $6.99
multi-receiver subscriptions." Joint Opposition at 14.

103.    Sirius offered the above pricing restrictions in order to persuade the FCC and
the public that the Sirius merger would not create a monopoly, lessen competition, result in
increased prices, or otherwise harm the consumer.  Indeed, the pricing restrictions were
particularly persuasive to the FCC, which noted that

> absent Applicants' voluntary commitments . . . the proposed
> transaction would increase the likelihood of harms to competition and
> diversity. . . . ***Applicants would have the incentive and ability to raise
> prices*** for an extended period of time.
>             * * * *
> Applicants, however, have proposed significant voluntary
> commitments regarding steps the merged company would take to

> mitigate harms and achieve public interest benefits. ***We find that absent those voluntary commitments and other conditions, the harms of the transaction would outweigh the potential public interest benefits.***

FCC Order at 5 (emphasis added).

104.    In addition, Sirius committed to ***increasing*** subscriber choice.  For example, Sirius and XM jointly committed that the merged company would provide an "a la carte" service that would allow subscribers to choose 50 channels (*i.e.*, a subset of the full menu) for a lower monthly fee than subscribers pay for the standard package.  In this way, the combined entity was supposed to improve the range of available options at no additional cost to subscribers.

105.    Although the FCC acknowledged that the merger would give monopoly power to the combined Company, the FCC approved the license transfers in large part because of the voluntary restrictions Sirius offered.  These restrictions did not eliminate Sirius's ability to harm consumers and competition, but merely limited some of the ways in which such damage could be inflicted. As noted by Jonathan S. Adelstein, one of the two FCC Commissioners who voted against approval, "consumers [would] get a monopoly with window dressing," given the "gaping loopholes" in the voluntary commitments. FCC Order at 98-99. Commissioner Adelstein's prediction has proven right.

106.    Based on these false representations, on March 24, 2008, the DOJ approved the merger.  The DOJ's approval statement, relying heavily on the misrepresentations of Defendants, stated in relevant part:

> ***The parties contended*** that they compete with a variety of other sources of audio entertainment, including traditional AM/FM radio, HD Radio, MP3 players (e.g., iPods), and audio offerings delivered

through wireless telephones. Those options, used individually or in combination, offer many consumers attributes of satellite radio service that they may find attractive. ***The parties further contended*** that these audio entertainment alternatives were sufficient to prevent the merged company from profitably raising prices to consumers in the retail channel – for example, through less discounting of equipment prices, increased subscription prices, or reductions in the quality of equipment service. [Emphases added.]

107.   Therefore, based on the representations and information supplied to it by Defendants, the DOJ concluded that the evidence "did not establish that the combined firm could profitably sustain an increased price to satellite radio consumers."

108.   FCC Commissioner Adelstein saw right through Defendants' deception of the DOJ, his dissent from the FCC's approval of the merger:

> Ostensibly, the DOJ relied on two key premises in reaching its decision: long-term sole source contracts with automobile manufacturers and the lack of an interoperable radio. Even though the DOJ acknowledged that the Applicants competed on the terms of automotive contracts, including the amount of equipment subsidization, it readily dispensed with this consumer benefit, because many of the sole-source contracts were locked up for extended periods. Further lack of competition between the Applicants was explained by their decision not to bring an interoperable radio to market despite a Commission requirement to do so. It is ironic that the DOJ relied on the Applicants' failure to comply with the interoperability mandate as a justification for the merger.

> \*   \*   \*   \*

> ***Interoperable Receiver.*** The [FCC] *Order* [approving the merger] characterizes the Applicants' interpretation of the Commission's interoperability requirement as "not unreasonable" to excuse their earlier failure to develop and market interoperable receivers. The Applicants' noncompliance created switching costs for consumers and, thus, limited pre-merger competition between the Applicants. Adding this condition today is virtually meaningless, because the merged entity will have every incentive to offer interoperable devices anyway. The point was to enforce the requirement before, not after, the merger.

Doing it now is clearly a case of closing the barn door after the cows got out.

109.     These actions were planned long before the regulator's approval.  They were also in direct breach of the promises made to the regulators and law enforcement officials. They rendered the DOJ's conclusion on the merger inaccurate and wrong.  The DOJ's determination that the merged company would not have monopoly power was grievously wrong.  Post-merger, Sirius did indeed have monopolistic power as evidenced by its ability to dictate profitable price increases.

110.     As alleged in the Antitrust Action, Defendants' actions further violated the antitrust laws by decreasing consumer choice.  For example, Sirius, under Defendants' leadership, is alleged to have failed to meet its commitment to add à la carte programming for $6.99 per month within one year of the merger, and by diminishing the variety and quality of programming.

111.     In addition, Sirius is alleged to have deceived its own customers concerning the royalty fee, by portraying it as simply a pass-through of increased royalty costs, when in reality, such fees far exceed any pass-through of actual increased royalty costs to Sirius.  The Antitrust Action alleges that Sirius is actually charging different rates to subscribers with different plans and *all* the rates exceed, by a substantial measure, the differential between the pre-merger rates and the post-merger rates that Sirius and XM, respectively, would pay.  Thus, Sirius is alleged to have used the Royalty Fee to disguise price increases that provide substantial revenue to the Company, as evidenced by the fact that Sirius includes Royalty Fees in "Other revenue" on its consolidated statements of operations.  *See* Sirius, Form 10-Q, at 37 (Nov. 5, 2009).

## THE MISCONDUCT IS REVEALED

### The Antitrust Action is Being Prosecuted on Behalf of a Certified Class of Subscribers, and this Court Denied Sirius' Motion for Summary Judgment on All Antitrust Claims

112.    It was not until December 2009, upon the commencement of the Antirust Action in this Court, that the nature of Defendants' misconduct was revealed.  The operative complaint in that action is the Second Amended Complaint, which was filed on May 3, 2010. It names Sirius as the only defendant.  After an early round of motion practice, Defendants eventually caused Sirius to move for summary judgment dismissing the claims. The plaintiffs, for their part, moved for class certification.

113.    On March 29, 2011, this Court (Baer, J.) granted class certification as to the antitrust claims, and denied Sirius' motion for summary judgment on the antitrust claims (while granting it with respect to certain state law claims).  The Court certified a class of

> All persons or entities who reside in the United States and who contracted with Sirius Satellite Radio, Inc., XM Satellite Radio Holdings, Inc., Sirius XM Radio Inc. or their affiliated entities for the provision of satellite digital audio radio services who, during the relevant period of July 29, 2008 through the present: (1) paid the U.S. Music Royalty Fee; (2) own and activated additional radios ("multi-radio subscribers") and paid the increased monthly charge of $8.99 per additional radio; or (3) did not pay to access the content available on the 32 [kbps] or 64 [kbps] connections on the Internet but are now paying the Internet access monthly charge of $2.99.

114.    The Antitrust Action also includes include factual claims regarding the Music Royalty Fee, the price increase from $6.99 to $8.99 on multiple subscriptions, and the Internet access charge.  It is proceeding proceed under both Section 2 of the Sherman Antitrust Act and Section 7 of the Clayton Antitrust Act.

115.    On May 13, 2011, a settlement of the Antitrust Action was announced by the plaintiffs and Sirius.  The Court has not yet approved the proposed settlement.  The settlement

proposes to pay Antitrust Class Counsel $13 million in legal fees and expenses, and it claims $180 million of benefits to the subscriber class in the form of forbearances by Sirius to implement price increases.  The terms of the settlement include:

(a)     agreeing to keep base prices for subscriptions (excluding life subscriptions) "at or below" their current rates until December 31, 2011;

(b)     agreeing to keep prices for multi-receiver subscriptions "at or below" their current rates until December 31, 2011;

(c)     agreeing to keep Internet streaming prices "at or below" the recently imposed price of $2.99 per month until December 31, 2011;

(d)     agreeing not to increase prices for "Best of" programming until December 31, 2011; and

(e)     agreeing to keep the U.S. Music Royalty Fee "at or below" its current price until December 31, 2011.

**Antitrust Damages are Likely to be Monumental**

116.     If the settlement of the Antitrust Action is not approved and that action is tried to a verdict or settled, it is likely to give rise to enormous compensatory damages to be paid by Sirius, with over 18 million subscribers in the certified class.  These damages will be the direct result of Defendants' misconduct in deceiving customers and shareholders alike as to their true intentions regarding the prices to be charged, and services offered, by the post-merger Sirius. Under the antitrust laws, moreover, civil damages may be *trebled*.

**Defendants Further Breach Their Fiduciary Duties by Agreeing to Accept Predatory Financing, and Resulting Dilution of Shareholders, from the Malone Group**

117.   Following the acquisition of XM (including the assumption of its debt, $600 million of which Karmazin professed to have been unaware of), Sirius had over $3 billion in total debt, hundreds of millions of dollars of which was coming due.  On or about February 10, 2009, Defendants disclosed that they had hired legal and financial advisors to guide it through a possible filing of a petition under Chapter 11 of the Bankruptcy Code.  Sirius creditors signaled that they would insist upon the removal of Karmazin as CEO if Defendants carried out their plans to put Sirius in bankruptcy.

118.   The Company needed an investor who could provide needed funds without extracting predatory terms.  One such investor was Charles Ergen of Dish Networks.  Ergen had been acquiring hundreds of millions of dollars of XM debt and had signaled that he would be interested in acquiring Sirius for $1.50 per share, a premium to the current market price.  Indeed, Ergen had made an offer to acquire Sirius in 2008, but was rebuffed by Defendants.  Now Ergen offered to infuse $500 million into Sirius and help restructure its debt (of which he owned hundreds of millions).  However, a condition of any transaction with Ergen was that Karmazin and the other existing Board members and executive officers of Sirius be replaced.  Moreover, an associate of Ergen, Joseph Clayton, was the former CEO of Sirius (before Karmazin) and now stood ready to serve as CEO of the merged entity.

119.   Despite its attractiveness to Sirius and its shareholders (the debt that was immediately coming due was held by Ergen and, thus, a deal with Ergen would have immediately solved the Company's short-term debt crisis), Defendants, fearful of losing their

positions, compensation, and perquisites as officers and directors of Sirius, spurned any possibilities of a transaction with Ergen. Instead, they looked for other transactions—*any* other transaction—in which the terms and fairness to Sirius' shareholders took second place to keeping their Board seats and their titles and positions as officers (including Karmazin as CEO). The Board thus entrenched themselves in violation of their duties to shareholders.

120.    It was at this point that Defendants made the fateful decision to turn to an investor group led by John C. Malone for relief. The Malone Group offered a take-it-or-leave-it transaction. The transaction involved granting the Malone Group preferred shares of Sirius that were convertible into 40 percent of the common stock of Sirius (measured at the time of conversion). The preferred shares had full voting rights of common stock on an as-converted basis. Moreover, the Malone Group would be able to immediately appoint three persons to the Sirius Board, and would retain the option of appointing three additional directors (an option which it recently exercised by appointing two additional Board members, Vogel and Wittman). In return, Sirius would obtain $530 million in financing to help it with the legacy XM Satellite debt load.

121.    The terms of the Malone transaction, already rich to the Malone Group, did not stop there, however. The $530 million in financing was to bear interest at the above-market rate of 15%. Moreover, John Malone was to personally receive $17 million as a "signing bonus." Defendants approved the Malone transaction, despite the fact that its primary purpose was to enrich John C. Malone and the Malone Group at Sirius' expense, and the transaction closed in early March 2009.

122.    The Malone transaction harmed Sirius and shareholders.  Despite wasting corporate assets in a one-sided deal that enriched the Malone Group, Defendants, in approving the transaction, caused not only existing shareholders to be diluted by the massive issuance of convertible preferred stock, but also their own Board seats to be compromised.  Defendants effectively gave away a pivotal and supermajority-blocking 40% of the Company, in exchange for simply providing a loan.  Where before, the Sirius directors, conflicted as they were, occupied eight out of eight Board seats, now they occupied only eight out of eleven seats—with the constant threat that, if they disagreed with or opposed the Malone directors in any way, the Malone Group could inflate the Board by three more seats, such that the original Sirius group occupied only a one-seat majority.  Thus, it would take only two "defectors" to give the Malone group a majority vote on any issue, and it would take only one "defector"—Karmazin, presumably—to give the Malone group a veto on any proposed action.  Such "defectors" would not be hard to find, given Karmazin's personal beholdenness to the Malone Group, and the other director's beholdenness to Karmazin.  Any remaining hope of an independent, disinterested Board evaporated.

123.    In addition to enriching John C. Malone and the Malone Group, the transaction enriched Karmazin (again).  In connection with it, the Board (now controlled by Malone) granted Karmazin an extension on his employment contract with Sirius—in addition to 128 million options on Sirius shares at 39 cents per share.  Karmazin currently enjoys gains of approximately $119 million on these options.

124.    Shareholders were denied a vote on the Malone transaction.  Defendants relied on an arcane Nasdaq rule to disenfranchise them in this instance.  Although Nasdaq normally

required shareholder approval of any transaction that would transfer control of 20% or more of the voting stock to a new party, an exception existed in situations where a delay in obtaining shareholder approval for such a transaction would "seriously jeopardize the financial viability" of a company. Defendants caused Sirius to invoke this exception, and the Nasdaq approved it before the Malone transaction closed. However the "emergency" that supposedly would jeopardize Sirius was entirely of Defendants'—and the Malone Group's—own making. Defendants and the Malone Group wanted the Malone transaction to be a done deal, and thus they made it so, foreclosing any other available opportunities (including negotiating with Ergen). Indeed, scarcely five weeks before invoking the Nasdaq exception (which essentially amounted to a "going concern" condition), Sirius had received from its newly-appointed auditors KPMG a "clean" audit opinion indicating a lack of any "going concern" issues. In the space of little over a month, when it suited Defendants to portray Sirius as healthy, they did so, and when it suited their purposes to portray the Company as diseased, they did so. All the while, shareholders were manipulated and deceived.

125.    Defendants' contempt for shareholders was evident even in how they carried through with the notice that the Nasdaq required to be given to shareholders when the "jeopardize the financial viability" exception was invoked. Nasdaq Rule 4350i required notice to be mailed directly to shareholders. However, not all shareholders received the notice,[1] reflecting the fact that Defendants had placed little or no priority on effectuating a key shareholder communication.

---

[1]     *See Goe, et al. v. Amble, et al.*, No. 11-650606 (N.Y. Supreme Ct., complaint filed Mar. 9, 2011), ¶ 47.

126.   Through their choice of the Malone transaction, though it provided a palliative to the Company's immediate debt crisis, Defendants only put increased pressure on Sirius to look to illegal price hikes for a solution.

## DERIVATIVE ALLEGATIONS

127.   Plaintiff brings this action derivatively in the right and for the benefit of Sirius to redress injuries suffered, and to be suffered, by Sirius as a direct result of the violations of state law, including breaches fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by Defendants.

128.   Sirius is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiff was a shareholder of Sirius at the time of the transactions complained of.  Plaintiff will adequately and fairly represent the interests of Sirius and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

129.   The wrongful acts complained of herein subject, and will continue to subject, Sirius to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

130.   The wrongful acts complained of herein were unlawfully concealed from Sirius' shareholders.

131.   Sirius, as alleged above, has eight "common stock" directors, and five "preferred stock" directors, the latter of whom are beholden to and answerable to John C. Malone, for a total of 13.

132.    Of these 13, eight were directors of either Sirius or XM while the merger was being reviewed by federal regulators and law enforcement officials.  These eight directors were Defendants Karmazin, Amble, Black, Hartenstein, Holder, Mooney, Shaw, and Gilberti.[2]

133.    During the time leading up to the merger, these pre-merger Defendants knew of the representations publicly made by Karmazin and others as to the intended effects of the merger, and as to the combined company's lack of ability or intention to effectuate anti-competitive price increases.  Despite such knowledge, and the knowledge that engaging in monopolistic pricing behavior could endanger the very existence of Sirius by exposing it to treble damage penalties, these pre-merger Defendants approved the very price increases that has subjected Sirius to such peril.

## DEMAND FUTILITY

134.    Plaintiffs have not made any demand on the Board of Sirius to institute this action since such demand would be a futile and useless act because the wrongful acts complained of show an abdication by Defendants of their fiduciary duties of due care and oversight.  Such abdication included, but was not limited to:

(a)    allowing the Company to become engaged in and/or suspected of potentially illegal and fraudulent activities, including violations of the federal antitrust laws and liability for treble damages;

---

[2]    Gilberti is not a named Defendant herein; the allegations herein relate to his conflicts as a director and his resulting inability to objectively consider pre-suit demand.

(c)     making and allowing knowingly false material representations to be made to federal regulatory and law enforcement officials so as to induce them to approve the merger; and

(c)     making and allowing knowingly false material representations to be made to shareholders in connection with seeking their necessary approval for the merger, which was approved only by the slimmest majority of Sirius shareholders.

135.    These acts, and the other improper acts set forth herein, which demonstrate a pattern of misconduct, were not, nor could they have been, the product of a valid or good faith exercise of business judgment.

136.    Whenever a director is entrusted to make a decision about a corporate transaction in which that director has a financial interest, the entire fairness doctrine is triggered.  That doctrine carries a presumption that the transaction was accomplished to favor the interests of the director over the corporation, and the director carries the burden of demonstrating that the transaction was actually entirely fair to the corporation.  Given that presumption and burden shifting, the business judgment rule is rebutted, and demand is not required.

137.    As detailed above, the Board members were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and its Committees.  The Board members abdicated their responsibility to oversee the Company's operations and instead directed and encouraged management, in the service of its own personal gain, to engage in illegal and/or improper conduct that rendered the Company's discussions with federal regulatory and law enforcement officials deceptive.  The Defendants'

conduct lacked any legitimate business purpose and was not a product of a valid exercise of business judgment. As such, demand is excused as futile.

138.    Moreover, while Sirius and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped millions of dollars of regular and bonus compensation, as well as hundreds of millions of dollars in stock option awards, as a result of their ineptitude, deception, and conscious dereliction of duty, and demand on them is therefore excused.

139.    **Karmazin** is conflicted from objectively considering pre-suit demand in that he is one of the principal wrongdoers who have lied to shareholders, regulators, the U.S. Congress, and the public, and have subjected Sirius to massive antitrust litigation and liability on a class-wide basis, as well as potential antitrust enforcement actions. Among other things, he led Sirius to misrepresent its anti-competitive intentions to federal regulators, customers, and shareholders and to cause it to accept predatory financing from the Malone Group without considering alternatives solely because of his personal relationship with Malone and Malone's promise to allow him and his Board to remain at the helm of Sirius and continue to receive lavish salaries, stock option awards, and other benefits. Indeed, Karmazin received over $43 million in unjust and excessive compensation from Sirius in 2009. He depends on Sirius for his livelihood. Based on this, he also is beholden to Gilberti (Chair), Mooney, Shaw, and

Holden, who constitute the Compensation Committee of Sirius and decide Karmazin's annual gains from running Sirius into the ground.

140.     **Karmazin**, like all other "common stock" Sirius directors, also is beholden to the directors in the Malone Group. This is because these directors chose the Malone Group's predatory financing proposal in preference to all other alternatives (and did not seek any alternatives) despite the fact that it diluted their positions and influence, diluted existing shareholder control of Sirius, represented a change in control, and harmed the Company, solely because the Malone promised to retain Karmazin in the CEO position and the other "common stock" directors would, through Karmazin's influence and being beholden to him, also retain their directorships and corresponding benefits. Karmazin is, in fact, involved with Malone intimately on a personal and social basis. The two are long-time friends, have socialized together frequently, and together have served on the board of the Lustgarten Foundation for Pancreatic Cancer Research for eleven years.

141.     **Amble** is Chair of the Audit Committee, which failed in its duties to provide oversight over the actions of Karmazin, other officers of Sirius, and other Defendants— including preventing the wholesale misrepresentations to regulators and shareholders and the Company's anti-competitive conduct giving rise to antitrust liability. She thus faces a substantial likelihood of liability for the breaches of fiduciary duty set forth herein.

142.     **Black** is a long-time director of Sirius and a close associate of Karmazin. He continued to occupy a seat on Sirius' Board despite the fact that shareholders withheld a majority of votes for him in the 2010 election of directors. He is thus illegitimate and

incapable of considering pre-suit demand objectively for this reason alone. Black has refused even to attend several meetings of the Board, in further violation of his duties.

143.     **Holden** also is a long-time director of Sirius and a close associate of Karmazin. He is a member of the Audit Committee and, for that reason, substantially likely to be liable for breach of fiduciary duty, as set forth above. Moreover, he sits on the Compensation Committee, which approved unjust and excessive compensation to Karmazin.

144.     **Mooney** also is a long-time director of Sirius and a close associate of Karmazin. He sits on the Compensation Committee, which approved unjust and excessive compensation to Karmazin.

145.     **Shaw** also sits on the Compensation Committee, which approved unjust and excessive compensation to Karmazin.

146.     **Gilberti** also is a long-time director of Sirius and a close associate of Karmazin. He is the Chair of the Compensation Committee, which approved unjust and excessive compensation to Karmazin.

147.     **Hartenstein** is a member of the Audit Committee and, as set forth above, is for that reason substantially likely to be liable for breach of fiduciary duty.

148.     **Malone, Maffei, Flowers, Vogel,** and **Wittman** are nominees of the Malone Group and, as such, their interests and loyalties lie to the Malone Group, not Sirius. They were added to the Board in and after February 2009, after the Malone Group imposed predatory financing terms on Sirius. It was in substantial part to fulfill the terms of the Malone Group's predatory financing that the other Defendants continued in their plans to raise

prices and otherwise violate the terms of their representations to regulators made in order to secure approval of the merger.

149.    Indeed, the original "Sirius directors"—those in place before the Malone transaction and consisting of **Karmazin, Amble, Black, Holden, Mooney, Shaw, Gilberti, and Hartenstein**—are themselves beholden to the Malone nominees.  Exercising powers granted them under the terms of the Malone transaction, the Malone Group can add yet another director, for a total of six on what would be a fourteen-member Board, yet further diluting the power and authority of the Sirius directors.

150.    By reason of the above, the Defendants, constituting a majority of the Board, face a substantial likelihood of liability for antitrust and other penalties incurred by Sirius, and thus are disabled from independently considering a demand to bring action concerning this matter, thus demand is excused.

151.    In addition, and as a result of their concealments and falsifications, many of the directors and managers of Sirius held onto their positions of power, prestige and profit at the Company.  The managers of Sirius obtained millions of dollars of salaries and bonuses which would have been denied them had the truth been disclosed. The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors.

152.    Furthermore, the Sirius Board is still dominated and controlled by the exact same wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of Sirius or its shareholders.  The present Board has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)      The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)      Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)      The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)      In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)      The members of the Sirius Board, including each of the Defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of Sirius.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are,

consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves.

153.    Demand must also be excused as to all of the members of the Board of Directors of the Company because each member of the Board either knew or was reckless or negligent in not knowing of the illegal and improper safety and disclosure practices that were sanctioned and approved at the Company throughout the relevant period. The Defendants will not now take action against the other members of the Board of Directors of Sirius because each of these Defendants engaged in or allowed Sirius to mislead Federal regulators, consumers, subscribers, and Company shareholders regarding the Company's post-merger pricing expectations.

154.    Demand is also excused because the Board has already failed, in the face of several pending lawsuits, to address the transactions challenged herein. The Board has thus been made aware of the improper conduct and has failed to even investigate it. This repeated resistance to correcting, or even investigating, improper conduct demonstrates that a demand on the Board to take action would be futile.

155.    Moreover, each of the Defendants, as a longstanding director and/or officer of Sirius, had intimate knowledge of all major operations of the Company, and yet he participated in dissemination of material misstatements of the Company's financial information. Thus, the Defendants all have a personal interest in concealing any blame for Sirius' internal control problems, and away from himself for consciously disregarding fiduciary duties. An investigation or inquiry that spread blame higher up the corporate ladder — to the officers or directors — would not be in the personal interest of the Defendants. The

result of such an inquiry would require them to return valuable but unearned compensation to the Company.

156.    Additionally, all of the Defendants face a sufficiently substantial likelihood of liability, and, thus, there is a reasonable doubt as to their disinterestedness in deciding whether pursuing legal action would be in the Company's best interests.

157.    Defendants also are conflicted in that pursuing the legal claims demanded in this derivative action would involve harming Sirius defense of the claims in the Antitrust Action, potentially rendering Sirius liable for billions in treble damages and themselves liable for contribution and indemnification from Sirius.  This conflict is all the more pronounced given that the Antitrust Action has successively overcome motions to dismiss and for summary judgment, and a class has been certified on the antitrust claims.

158.    Finally, demand is further excused as futile by the fact that various shareholders repeatedly have complained to the Sirius Board, which has ignored or rebuffed them.  These include:  (a) Michael Hartlieb on Sept. 22, 2010; (b) Michael Hartlieb on May 1, 2010; and (c) Michael Hartlieb on Nov. 5, 2008.  By citing such further examples, Plaintiff, who made no similar demand, does not concede that even at the time, making such demand would have been anything but futile.

## GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS

159.    The Defendants had stringent fiduciary obligations to Sirius and its shareholders.

160.    By reason of their positions as officers, directors and/or fiduciaries of Sirius and because of their ability to control the business and corporate affairs of Sirius, the Defendants owed Sirius and its shareholders fiduciary obligations of loyalty, good faith, due

care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage Sirius in a fair, just, honest and equitable manner. The Defendants were and are required to act in furtherance of the best interests of Sirius and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

161.    Each director and officer of the Company owes to Sirius and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held Company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's true intentions regarding Sirius' post-merger activities.

162.    The Defendants, because of their positions of control and authority as directors and/or officers of Sirius, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Sirius, each of the Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Sirius.

163.    At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of Sirius, and was at all times acting within the course and scope of such agency.

164.    To discharge their duties, the officers and directors of Sirius were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the operational affairs of the Company.  By virtue of such duties, the officers and directors of Sirius were required to, among other things:

    a.  refrain from acting upon material, inside, corporate information to benefit themselves;

    b.  conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

    c.  properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    d.  ensure that the Company's financial statements were based on appropriate support and documentation, and were routinely checked for accuracy;

    e.  ensure that financial records could not be manipulated;

    f.  ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

    g.  ensure that these were sufficient checks and balances in Sirius' accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of revenue or asset values; and

h.  ensure that no inaccurate financial information about Sirius was released to the public that would tend to artificially inflate Sirius' stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

165.  Each of the Defendants, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, due care, disclosure, candor, and oversight in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sirius, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders. The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company. The conduct of the Defendants who were also officers and/or directors of the Company during the relevant period has been ratified by the remaining Defendants who collectively comprised all of Sirius' Board during the relevant period.

166.  The Defendants breached their duties of loyalty and good faith by allowing, or by themselves causing, Sirius to disregard repeated misrepresentations to regulatory officials and Company shareholders regarding the intentions to not lower subscription rates in a monopolistic fashion, thus exposing the Company to antitrust treble damage claims. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Sirius, through the Defendants, knew that the adverse

facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. As a result of defendant's illegal actions and course of conduct during the relevant period, the Company is now subject to class action lawsuits that allege violations of both federal and state law. As a result, Sirius has expended, and will continue to expend, significant sums of money.

## SPECIFIC FIDUCIARY DUTIES OF DEFENDANTS

### Duties of the Audit Committee

167.    The Audit Committee currently comprises the following Defendants: Amble, Hartenstein, Holden, and Mooney. Amble serves as Chairman.

168.    The primary purpose of the Audit committee is to assist the Board of Directors in fulfilling its responsibility to oversee management's conduct of the company's financial reporting process, including the development and maintenance of systems of internal accounting and financial controls and the outside auditor's annual audit of the Company's financial statements.

169.    The Charter of the Audit Committee contains specific areas of responsibility, including:

- "No member may have a relationship to the Company that may interfere with the exercise of his or her independence from management and the Company."

- "The Committee shall receive reports on legal compliance and litigation matters and review the significant reports as well as management's responses thereto."

### Duties Set Forth in Sirius' Code of Conduct

170.   Sirius' Code of Conduct renders on all Company management and executives, including directors, the following duties:

- "Employees and directors have a duty to the Company to advance its legitimate interests whenever the opportunity arises. Individuals should not take for themselves personally, or for their friends or family, opportunities that are discovered through the use of Company property, information or position (other than those received in the ordinary course of doing business and approved by the Company). Furthermore, all individuals are prohibited from competing with the Company unless such competition is disclosed to Sirius's General Counsel and approved in writing."

- "Employees and directors are not permitted to take or make unauthorized use of, steal, or knowingly misappropriate the property of the Company for the individual's own unauthorized use, the unauthorized use of another or for an improper or illegal purpose. Employees and directors are not permitted to remove, sell, loan, convey or dispose of any record, voucher, money or thing of value belonging to the Company without the Company's written consent. No individual may destroy Company property without proper authorization. Participation in unlawful activities or possession of illegal items or substances, whether or not on Company property or business, may subject the individual to disciplinary action, including the possibility of dismissal."

- "Any individual who possesses confidential information has an important responsibility to keep that information confidential within the Company, and to disclose such information internally only on a "need to know" basis. Individuals must be discreet with this information and avoid communicating Company matters in ways that are susceptible to interception or use by third parties."

- "It is each individual's responsibility to know and understand the laws applicable to his or her job responsibilities (including insider trading laws), to comply with both the letter and the spirit of those laws, and to always act with the highest ethical standards of business conduct. Furthermore, individuals must avoid not only actual misconduct but also even the appearance of impropriety. In the case of any questionable conduct, they must consider how they and the Company would be perceived if the conduct were publicized. Each individual should consult with his or her immediate supervisor or Sirius's General

Counsel with any questions concerning any legal or ethical requirements."

- "It is critically important that financial statements and related disclosures be free of material errors. Employees and directors are prohibited from knowingly making or causing others to make a materially misleading, incomplete or false statement to an accountant or an attorney in connection with an audit or any filing with any governmental or regulatory entity."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

171.    In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted, and/or assisted, each other in breach of their respective duties.

172.    During the relevant period, the Defendants collectively and individually initiated a course of conduct that was designed to and did:   (i) cause the Company to issue false and misleading results regarding the Company's price expectations and post-merger pricing power; (ii) cause the Company to lie to the DOJ and the FCC regarding the Company's post-merger intentions; (iii) maintain the Defendants' executive and directorial positions at Sirius and the profits, power and prestige that the Defendants enjoyed as a result of these positions; and (iv) deceive shareholders regarding the Defendants' management of Sirius' operations, the Company's financial health and stability, and future pricing practices. In furtherance of this plan, conspiracy and course of conduct, the Defendants collectively and individually took the actions set forth herein.

173.    The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants'

violations state law, including breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's prices for SDARS and its compliance with laws and regulations relating to pricing and services, including subscription prices and the provision of interoperable radios.

174.   The Company's promises and representations as to price expectations and post-merger pricing power were made publicly over many months and were known to members of the Board of Directors of each constituent company, and to the vast majority of the present Sirius directors. The recent increases represent conduct the Company promised that it would not, and could not, engage in post-merger. The price increases and newly imposed charges were done openly and notoriously within the Company, were made a core part of Sirius' business plan, and were know to and approved by all members of the Board of Directors.

175.   Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## COUNT I

### Derivatively Against all Defendants for Breach of Fiduciary Duty

176.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.    The Defendants owed and owe Sirius fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe Sirius the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

178.    The Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

179.    Each of the Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the pricing expectations of the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

180.    The Defendants caused or allowed Sirius to lack requisite internal controls, and, as a result, the Company's ability and willingness to maintain stable or provide reduced prices for its SDARS were materially misstated, with the further result that the Company did not account for the costs, expenses, fines, penalties, judgments, and settlements likely to occur in connection with its anti-competitive conduct in violation of the antitrust laws.

181.    The Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

182.    In addition, as detailed above, Defendants violated their duty of candor and full disclosure to shareholders, lying to them that the Company intended to observe the limitations contained within its promises to federal regulators regarding price increases and other potentially anti-competitive conduct, and lying to them that the Company could not, and would not, engage in such conduct.

183.    Defendants further breached their fiduciary duties, among other things, by:

(a)     Failing to properly disclose all material information a reasonable shareholder would deem important as to alternatives to the Malone transaction;

(b)     Enacting a shareholder rights plan ("poison pill") that only benefited the Malone Group and that prevented other suitors from making unsolicited bids for Sirius at a higher price or on more favorable terms than the Malone transaction—thus ensuring that the Malone Group, and only the Malone Group, can tender for the remaining shares of Sirius that it does not own. (The Malone Group was granted a rights offer after completion of the Malone transaction.);

(c)     Allowing the Malone Group itself to vote its shares on the "poison pill" provision;

(d)     By entering into the predatory Malone transaction and spurning all alternative financing transactions on more favorable terms to Sirius and its shareholders, so as to retain their positions and corresponding benefits and out of loyalty to Karmazin, who counted Malone as a close personal friend and business associate, predating his service at Sirius; and

(e)     By failing to provide proper and adequate written notice to shareholders pursuant to Nasdaq Rule 4350i prior to completing the Malone transaction.

184.    As a direct and proximate result of the Defendants' failure to perform their fiduciary obligations, including their gross mismanagement and abuse of control, Sirius has sustained and will sustain significant damages, including the imposition of treble antitrust damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

185.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sirius, for which they are legally responsible.  Among the abuses of control was the Defendants' failure to supervise, and to exert internal controls over, and conscious disregard of responsibilities involving public statements represented to Federal regulators, consumers, and shareholders.

186.    In addition, by their actions alleged herein, the Defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the public statements of Sirius in a manner consistent with the operations of a publicly held corporation.

187.    As a direct and proximate result of the Defendants' abuse of control, Sirius has sustained significant damages and potentially faces the imposition of treble damages, on a class-wide basis on behalf of over 18 million subscribers, in the Antitrust Action.  In addition, Sirius' stock trades at levels that are approximately 75% reduced from pre-merger levels, and Defendants have wasted corporate assets in the form of the one-sided Malone transaction and option, stock, and salary awards to Karmazin and John C. Malone which were beyond the levels which any reasonable person would deem appropriate.

188.    As a result of the misconduct alleged herein, the Defendants are liable to the Company.

## COUNT II

### Derivatively Against all Defendants for Unjust Enrichment

189.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Sirius.  While these Defendants received millions of dollars in salary, fees, stock and options awards, and other largesse, the Company's market-capitalization was eviscerated.

191.     Plaintiff, as a shareholder and representatives of Sirius, seeks restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

192.     Plaintiff on behalf of Sirius has no adequate remedy at law.

## COUNT III

**Derivatively Against Defendants Karmazin, Black, Gilberti, Holden, Mooney, and Shaw for Violations of § 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

193.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194.     As alleged above, throughout the relevant period, Defendants Karmazin, Black, Gilberti, Holden, Mooney, and Shaw (the "10(b) Defendants"), by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and shareholders in connection with the Company's purchase of all the shares of XM in the merger, all in violation of Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

195.   The 10(b) Defendants, as the directors of Sirius with ultimate responsibility to manage its affairs, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, these Defendants were in a position to and did control all of the false and misleading statements and omissions made on behalf of the Company, including the contents of all its public SEC filings and reports and press releases, including the Merger Proxy Statement.  In addition, certain of these false and misleading statements constitute "group published information," which Defendants were responsible for creating.

196.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts.  Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of concealing the true financial and operating condition of both the acquired company, XM, and of the post-merger combined Company if the merger were approved, including its ability and willingness, under Defendants' direction, not to raise prices but, instead, to lower them.  Each of these material misrepresentations and omissions was untrue, as set forth herein.

197.   The 10(b) Defendants had the motive and opportunity to commit fraud.  By virtue of their positions of control over the entire management of the Company, the Defendants had unquestioned opportunity to issue statements that they knew were false and

misleading, including by signing or approving the Merger Proxy Statement. Karmazin had the motive to commit fraud because of his desire to entrench himself in the CEO position and continue to receive titanic grants of options which he could cash out for hundreds of millions of dollars. Each of the remaining 10(b) Defendants had the motive to actively approve, acquiescence in, and facilitate the fraud led by Karmazin because they sought to maintain their positions of power and perquisites and would do anything to hold on to them, were beholden to Karmazin and would blindly follow his lead on any issue, were dominated and controlled by him, and thus, committed primary fraud.

198.    The Company exchanged its shares for the shares of XM in the Merger, which the 10(b) Defendants' false statements induced. The Company relied upon the Section 10(b) Defendants' misstatements and omissions in that but for the 10(b) Defendants' deceptive acts, shareholders would not have approved the Merger and the Company would not have entered into it, and in that the misstatements and omissions were made in connection with a transaction that required shareholder approval and such approval was sought.

199.    The misstatements and omissions were material because disclosure of the true facts would have been considered significant by a reasonable shareholder in connection with voting on the Merger and by the Company other than the 10(b) Defendants in consummating it.

200.    The Company has been harmed by the 10(b) Defendants' misstatements and omissions in that Defendants' decision to raise prices instead of lower them and thereby execute on the strategy of concealment set forth herein has directly and proximately caused the Company's exposure to massive antitrust liabilities and related harms, as set forth herein.

201.    Accordingly, the 10(b) Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

    a.    employed devices, schemes and artifices to defraud;

    b.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Sirius in connection with its exchange of Sirius shares for XM shares in connection with the merger.

202.    By reason of such conduct, the 10(b) Defendants are liable to the Company.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

    A.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' fiduciary breaches, including damages paid in respect of numerous lawsuits pending against the Company from the Defendants conduct leading Sirius to operate as a monopolistic enterprise.

    B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' unjust enrichment or their other assets so as to assure that Plaintiff on behalf of Sirius has an effective remedy;

C.      Awarding to Sirius restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Directing  Sirius to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Sirius and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies, including measures to:

1.      Strengthen the Board's supervision of operations and accounting procedures and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      Permit the shareholders of Sirius to nominate at least three candidates for election to the Board;

3.      Appropriately test and then strengthen the internal audit and control functions so as to avoid a recurrence of the deceptive dealings with federal law enforcement and regulatory officials set forth herein, and the Company's pricing policies; and

4.      Terminate Karmazin as CEO and remove him from the Board.

E.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Dated: June 23, 2011                    **KAHN SWICK & FOTI, LLC**

By: _____
Lewis S. Kahn (*pro hac vice*)
*lewis.kahn@ksfcounsel.com*
Albert M. Myers (a member of the bar of this Court)
*albert.myers@ksfcounsel.com*
Melinda A. Nicholson (a member of the bar of this Court)
*melinda.nicholson@ksfcounsel.com*
206 Covington Street
Madisonville, Louisiana 70477
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Attorneys for Plaintiff Robert Michael Shenk*

## VERIFICATION

I, Robert Michael Shenk, declare under penalty of perjury of the laws of the United States that I have reviewed the Amended Shareholder's Derivative Complaint in the case captioned *Robert Michael Shenk v. Melvin Alan Karmazin, et al.*, S.D.N.Y., and I authorize its filing. I have reviewed the allegations made in the Amended Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true.

Robert Michael Shenk

Date: 6-23-11